IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GOOD RIVER FARM, LP, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:17-CV-1117-RP |
| MARTIN MARIETTA MATERIALS, INC., and TXI OPERATIONS, LP, | § § § § | |
| Defendants. | § § § | |

**ORDER**

Before the Court is Defendants Martin Marietta Materials, Inc.'s and TXI Operations, LP's ("Defendants") renewed motion for judgment as a matter of law, (Dkt. 140). Plaintiff Good River Farm, LP ("Good River") filed a response, (Dkt. 143), and Defendants filed a reply, (Dkt. 145). Having reviewed the briefing, the record, and the relevant law, the Court will deny the motion.

**I. BACKGROUND**

This case arises out of the October 31, 2015, rainfall and flood that inundated and caused severe damage to Good River's pecan farm. (2d. Am. Compl., Dkt. 54, at 4). Good River filed suit in Travis County District Court on October 27, 2017, and Defendants removed the case on November 27, 2017. (Notice, Dkt. 1, at 2). In their amended complaint, Good River brought claims of private nuisance, negligence, negligence per se, as well as a violation of Texas Water Code § 11.086. (2d Am. Compl., Dkt. 54).

Good River and Defendants own land directly across from one another on the Colorado River. (*Id.* at 2). Defendants use their land for strip mining. (*Id.* at 2). Their mining resulted in the presence of the pit, which is filled with groundwater and located about 200 feet from the banks of the Colorado River. (*Id.* at 2; Mot. Summ. J., Dkt. 43, at 2). In October 2013, a flood caused two

breaches on the west and east sides of the north end of the pit. (Schiwitz Decl., Dkt. 43-1, at 4). While these breaches "released a deluge of impounded surface water," the resulting flooding of Good River's property did not cause damage to the farm during that particular flood. (2d Am. Compl., Dkt. 54, at 2). In early 2015, Defendants' Equipment Operator, Dennis Schiwitz, repaired the west breach of the north end of the pit but did not repair the east breach of the north end of the pit until 2017. (Schiwitz Decl., Dkt. 43-1, at 4)

On October 30, 2015, heavy rainfall and flooding upstream caused flooding to both Defendants' and Good River's properties. (2d Am. Compl., Dkt. 54, at 4). Good River alleges that after Defendants had evacuated their property, which was already flooded, workers on the Good River farm saw "water coming over the northernmost wall" of the pit, which "rushed into, through, and across the river, both diverting the natural flow of the river and rushing onto" Good River's farm. (*Id.* ("[W]orkers on the farm witnessed the flood current running perpendicular to the Colorado River.")). At the time of the October 2015 flood, the east breach at the north end of the pit had not been repaired. (Dkt. 43-1, at 4). Good River also alleges that a breach existed at the western wall of the pit at the time of the October 2015 flood. (2d Am. Compl., Dkt. 54, at 3).

After nearly five years of litigation, this case went to trial in August 2022. During the charge conference, Plaintiffs' conceded their claims for gross negligence and exemplary damages, and the verdict form omitted Plaintiffs' claim for strict liability nuisance. (Minute Entry, Dkt. 127; Verdict, Dkt. 135). Prior to deliberations, Defendants made both an oral and written motion for judgment as a matter of law under Rule 50(a). (Mot., Dkt. 128; Minute Entry, Dkt. 129). The Court denied the motion without prejudice to Defendants re-urging it after the jury's deliberations. (Minute Entry, Dkt. 129). On August 24, 2022, the jury reached a verdict, and found that Defendants diverted or impounded the natural flow of surface waters in a manner that proximately caused damage to Good River's property in violation of Texas Water Code § 11.086. (Verdict, Dkt. 135). They further found

that Defendants' negligence was 100% responsible for proximately causing Good River's damages. (*Id.*). The jury returned a verdict for Plaintiff for this violation in the amount of $659,882.00. (*Id.*).[1]

On September 21, 2022, Defendants filed a renewed motion for judgment as a matter of law, or, in the alternative, a motion for a new trial. (Dkt. 140). Defendants' motion largely repeats the arguments that they raised on summary judgment, (Mot. Summ. J., Dkt. 43). Both here and in that motion, Defendants argued that because the surface water that flowed from the pit mixed with the Colorado River, it became part of the watercourse and ceased to be "surface water" under § 11.086. (*Id.* at 7; Mot. JMOL, Dkt. 140, at 5). The Court denied Defendants' motion for summary judgment in relevant part, finding that there was a genuine factual dispute about whether the water from Defendants' property became "accustomed to flow" in the Colorado River. (Order, Dkt. 63). In their renewed motion for judgment as a matter of law, Defendants argue that the evidence at trial was insufficient to show that the waters that flooded Good River's property were surface waters, rather than floodwaters from the Colorado River. (Mot. JMOL, Dkt. 140, at 7). They further argue that there was insufficient evidence to support a finding that Martin Marietta ("Marietta") caused the flooding because he owed no duty to Good River. (*Id.* at 11). Finally, Defendants argue that Good River failed to produce enough evidence to show causation between Marietta's conduct and Good River's damages. (*Id.* at 13).

## II. STANDARD OF REVIEW

### A. Motion for Judgment as a Matter of Law

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) (quoting *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) (per curiam) (citation and internal quotation marks omitted)). Under Rule 50(b) "[a] motion for judgment

---

[1] The jury found for Defendants in that they did not intentionally or negligently create a private nuisance.

as a matter of law should be granted if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Id.* (citation and internal quotation marks omitted). At this stage, a court's "review of a jury's verdict is 'especially deferential.'" *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 675 (5th Cir. 2016) (quoting *SMI Owen Steel Co. v. Marsh U.S.A., Inc.*, 520 F.3d 432, 437 (5th Cir. 2008)). The court "view[s] the entire record in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and 'leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury.'" *Aetna Casualty & Surety Co. v. Pendleton Detectives of Mississippi, Inc.*, 182 F.3d 376, 378 (5th Cir. 1999) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir. 1994)). The court may grant a motion for JMOL "[o]nly when the facts and reasonable inferences are such that a reasonable juror could not reach a contrary verdict." *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir. 1998). "If reasonable persons could differ in their interpretation of the evidence, the motion should be denied." *Id.*

### B. Motion for New Trial

"A district court can grant a motion for new trial [under Federal Rule of Civil Procedure Rule 59(a)] if the first trial was unfair or if the jury verdict was against the great weight of the evidence." *Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996). Rule 59 allows the Court to grant a new trial "on all or some of the issues" presented in the initial trial. But "even when only one issue is tainted by error or prejudice, a new trial must nevertheless be granted on all issues 'unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without

4

injustice.'" *Eximco, Inc. v. Trane Co.*, 748 F.2d 287, 290 (5th Cir. 1984) (quoting *Gasoline Prod. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931)).

The Fifth Circuit has identified three factors that support granting a new trial: "the simplicity of the issues, 'pernicious occurrences' at trial, and the extent to which the evidence is in dispute." *Id.* (quoting *Scott v. Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989)). This test is disjunctive; only one factor must weigh in favor of granting a new trial, and even if none do, a new trial may be justified when other indicia demonstrate that the jury verdict was incorrect. *Id.* at 460–61. This standard requires the jury's verdict to be "against the great—not merely the greater—weight of the evidence." *Scott*, 868 F.2d at 789 (quoting *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 362–63 (5th Cir. 1980)). "[M]ere conflicting evidence or evidence that would support a different conclusion by the jury cannot serve as the grounds for granting a new trial." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

### III. DISCUSSION

Defendants' motion presents three distinct arguments: (1) that no violation of § 11.086 could have occurred because the Colorado River separates the properties; (2) that Good River's negligence claim fails as a matter of law because Defendants had no duty to Good River related to floodwaters; (3) that the evidence is legally insufficient to support a finding of proximate cause. (Mot. JMOL. Dkt. 140, at 5–12). The Court will address each argument in turn.

#### A. Surface Water and Section 11.086

Defendants argue that the water that flooded Good River's farm should be classified as "floodwater" rather than "surface water" and excluded from liability under § 11.086. (Mot. JMOL, Dkt. 140, at 7). They contend that the surface water flowed from its pit, mixed with the Colorado River before flooding Good River's farm, and therefore lost its identity as "surface water" and became "floodwater." (*Id.*). Ultimately, this argument fails for two reasons: (1) Texas law does not

require surface water to be the exact same water that directly floods the property, and (2) even if it did, Good River produced evidence that the surface water did cause at least part of the damage.

### 1. Definitions

Texas Water Code ("TWC") Section 11.086 provides, "No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded." Tex. Water Code. Ann. § 11.086(a). The term "surface water," is not defined by the statute, but has been generally interpreted by Texas courts to mean water "which is diffused over the ground from falling rains or melting snows, and [it] continues to be such until it reaches some bed or channel in which water is accustomed to flow." *Dalon v. City of DeSoto*, 852 S.W.2d 530, 538–39 (Tex. App.—Dallas 1992, writ denied). Additionally, "[t]he chief characteristic of 'surface water' is that it does not follow a defined course or channel and does not gather into or form a natural body of water." *Id.* at 538. Damages are allowed under § 11.086 when "(1) a diversion or impoundment of surface water, (2) causes, (3) damage to the property of the plaintiff landowner." *Dietrich v. Goodman*, 123 S.W.3d 413, 417 (Tex. App.—Houston 2003, no pet.).

Texas courts have denied liability where the defendant diverted or impounded a watercourse or floodwater, rather than surface water. A watercourse is defined as having "(1) a bank and bed, (2) a current of water, and (3) a permanent source of supply." *Dietrich*, 123 S.W.3d at 418 (citing *Hoefs v. Short*, 273 S.W. 785, 787 (Tex. 1925)). Separately, "[f]loodwaters are those which, generally speaking, have overflowed a river, stream or natural water course and have formed a continuous body with the water flowing in the ordinary channel." *Valley Forge Ins. Co. v. Hicks Thomas & Lilienstern, L.L.P.*, 174 S.W.3d 254, 258 (Tex. App.—Houston 2004, pet. denied) (quoting *Sun Underwriters Ins. Co. v. Bunkley*, 233 S.W.2d 153, 155 (Tex. App.—Fort Worth 1950, writ ref'd)). Courts in Texas have held that "surface water" may change in character once it comes "under the control and direction of a

watercourse." *Dietrich*, 123 S.W.3d at 420; *see also Dalon*, 852 S.W.2d at 538–539 ("[I]f the floodwater forms a continuous body with the water flowing in the ordinary channel, or if it temporarily overflows presently to return, as by recession of the waters, it is to be regarded as still a part of the stream") (internal citations omitted).

### 2. Impoundment of Surface Water vs. Floodwater

Turning to the merits of the motion, Defendants argue that § 11.086 forecloses liability if the surface water has become floodwater, as they allege it did here when it crossed the Colorado River. The first issue with this argument is that it does not align with the actual text of the statute. The first two subsections of the statute state:

> (a) No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.
> (b) A person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow.

Tex. Water Code Ann. § 11.086(a)–(b).

Under the plain meaning of the statute, the water which damages the property of another does not have to be surface water. Rather the inquiry is whether the defendant's conduct diverts or impounds surface water in a way that causes damage by an overflow of water. The statute does not require that the surface water remain surface water by the time it reaches a plaintiff's property. The subsection does not state that the "overflow of water" must be entirely from surface water—only that the impoundment of surface water must be the producing cause of the damage. Here, surface water from Defendant's property flowed over and across the Colorado River. Defendant argues that this precludes liability because the water, having at least partially mixed with the river, was no longer "surface water." (Mot. JMOL, Dkt. 140, at 7). But this argument adds a requirement that does not exist in the statute. It may be highly uncommon for surface water to build up in such a large volume that it can flow across or displace water in a creek or river, but the statute does not preclude liability

in those uncommon situations, as was the case here. Damages are not per se excluded under Texas law just because the water is no longer entirely "surface water."

At trial, the jury found that Defendants violated Subsection (a) by unnaturally impounding surface water. *Id.* § 11.086(a). The jury also found that the unnatural impounding proximately caused damage to Good River's property. The plain text of the statute allows a plaintiff to recover when the overflow of surface waters damages their property. Because the statute contains no requirement that the water be entirely surface water when it reaches the plaintiff's property, the Court will not read in such a requirement where none exists. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) ("[W]hen possible, we discern [legislative intent] from the plain meaning of the words chosen.").

Defendants' reliance on various Texas appellate court cases does not change this analysis. In *Dietrich*, the Court of Appeals held that the defendant's blockage of a sewer drain did not qualify for liability under § 11.086 because it was no longer surface water when it reached the end of the drain. *Dietrich*, 123 S.W. 3d at 417–21. In *Dalon*, the Court of Appeals denied liability where a creek had been eroded and damaged the plaintiffs' property. *Dalon*, 852 S.W. 2d at 539. While these cases discuss the definition of surface water, they are not analogous to the instant suit. In both *Dietrich* and *Dalon*, the courts discussed whether defendants had manipulated surface or floodwaters, and ultimately concluded that the defendants' actions only impounded water that had already become floodwater prior to the impoundment. To the contrary, here, Defendants do not argue that they impounded floodwater—only that the impounded surface water later became floodwater. They do not dispute that the water which Defendants originally impounded was, at first, surface water. Because *Dietrich* and *Dalon* foreclose liability on the basis that the defendants' wrongful conduct dealt only with floodwaters, the holdings do not apply to this case.[2]

---

[2] Defendants also cite a case from the Southern District of Texas where the district court held, "The notion of tracing water in an oversaturated bayou back to its original source to determine the applicability of an insurance provision has no foundation in the policy language, caselaw, or common sense." *Salcetti v. AIG Prop. Cas. Co.*, 529 F. Supp. 3d 681, 683 (S.D. Tex. 2021). That case, however, dealt with insurance, and

8

*Bonin II* is likely the most applicable case here but is neither binding authority in this district nor substantially similar on the facts. *Bonin v. Sabine River Auth. of Tex.*, No. 1:17-CV-00134-TH, 2019 WL 1246259, at *6 (E.D. Tex. Mar. 1, 2019), *report and rec. adopted*, No. 1:17-CV-00134-TH, 2019 WL 1244705 (E.D. Tex. Mar. 18, 2019), *aff'd*, 961 F.3d 381 (5th Cir. 2020) (hereinafter "*Bonin II*"). In *Bonin II*, the Eastern District of Texas held that the plaintiff could not recover because they had not "include[d] any facts in the operative complaint to even remotely suggest that the waters which damages their properties were surface waters." *Bonin II*, 2019 WL 1246259 at *7. Because the surface water had flowed into the Sabine River and the damage occurred downstream, the surface water had transitioned into floodwater.³ *Id.* By contrast, Good River did allege facts that surface waters—not just floodwaters—damaged its property. (*See, e.g.*, 2d Am. Compl., Dkt. 54, at 9 (alleging impounding of surface water which overflowed)). Unlike in *Bonin II*, Good River alleged and provided evidence showing that the surface water ran "perpendicular to the river into [Good River's] farm without traveling down the channel of the River, caused damage to [Good River's] property." (*Id.*). Because *Bonin II* dealt with downstream effects of floodwater, it does not apply to surface water which crosses over and periductular to a river's stream, where proximate cause is far more apparent.

A Texas Court of Appeals' decision in *Texas Woman's University* is instructive. *Texas Woman's U. v. The Methodist Hosp.*, 221 S.W.3d 267 (Tex. App.—Hous. 2006, no pet.) (hereinafter "*TWU*"). which explicitly denied summary judgment because the defendant could not show that plaintiff's

---

explicitly distinguished between insurance and water cases. *Id.* ("Their primary support for this theory is a forty-year-old Fifth Circuit case that was about strict liability for dam operation, not insurance.") (citing *Ford Motor Co. v. Dallas Power & Light Co.*, 499 F.2d 400 (5th Cir. 1974)). And in *Salcetti*, where the upstream release of water raised the general water level of a bayou, the causation element was far more attenuated than it is here, with the direct flooding of a property across a river. *Id.*

³ The facts of *Bonin II* are nearly identical to those in *Salazar v. Sanders*, another case relied on by Defendants. 440 S.W.3d 863, 873 (Tex. App.—El Paso 2013, pet. denied). In that court's brief analysis of the issue, it held that § 11.086 was inapplicable because the water was diverted "from the Rio Grande River, a natural watercourse, into a man-made irrigation canal and then fed into an appurtenant man-made ditch controlled by floodgate. As such it is no longer diffused surface water and Section 11.086(b) of the Texas Water Code is inapplicable." *Id.* For the same reason that *Bonin II* does not foreclose liability, the holding in *Salazar* does not prohibit Good River's recovery.

property "was flooded exclusively due to a . . . natural watercourse." *Id.* at 280. The Court of Appeals explicitly limited *Dietrich* to facts involving "the diversion of a water flowing in a watercourse." *Id.* at 283. As is the case here, the Court of Appeals recognized that the relevant inquiry is whether the defendant's conduct impounded surface water, and held that the defendant could therefore be found liable where their conduct potentially dealt with the flow of surface water at the time of their diversion/impoundment. *Id.* at 279–83. In *TWU*, the Court of Appeals focused on the identity of the water at the time it was diverted—not the identify of the water when it flooded plaintiff's property. *Id.* Likewise here, because the jury found that Defendant impounded surface water, it is liable under § 11.086.

### 3. Whether the Water Was Still "Surface Water"

Even if § 11.086 did foreclose liability for actions on surface water which subsequently become floodwater, it is not clear that the water which damaged Good River's farm was entirely floodwater. In its order, the Court denied summary judgment because there was a factual dispute about whether the water "became 'accustomed to the flow' of the Colorado River before entering the Good River property." (Order, Dkt. 63, at 6 (citing *Bonin II*, 2019 WL 1246259 at *7)).

Defendants cite several cases which deny liability for downstream flooding. (Mot. JMOL, Dkt. 140, at 9–10 (citing *Raburn v. KJI Bluechip Inv.*, 50 S.W.3d 699, 704 (Tex. App.—Fort Worth 2001, no pet.); *Salazar v. Sanders*, 440 S.W.3d 863, 873 (Tex. App.—El Paso 2013, pet. denied); *Bonin II*, 2019 WL 1246259 at *7)). But each of these cases dealt with surface water that collects into a river and creates flooding downstream, after the surface water has joined the river. In other words, the cases do not address the question of whether surface water becomes floodwater when it flows *across* a river (as opposed to *with* the river). Given that the surface water accumulation must be so great that it momentarily alters the course of the river and flows perpendicular to its natural

10

direction, it is unclear that any Texas courts have addressed the question of whether that water remains surface water.[4]

Ultimately, the Court finds no convincing reason that surface water should automatically lose its identity by flowing over and across a river. In *Dalon*, the Court of Appeals held, "Surface waters do not follow a defined course or channel and do not gather into or form a natural body of water." 852 S.W. at 538. The court further held, "[t]he chief characteristic of surface water is its inability to maintain its identity and existence as a body of water, distinguishing it from water flowing in a natural watercourse." This language from *Dalon* directly copied the definition from the American Jurisprudence treatise on waters. *Id.* (citing 78 Am. Jur. 2d *Waters* § 117, at 561 (1975)). That same treatise notes that "what starts out as surface water may become a natural watercourse at the point where it begins to flow in a reasonably well defined channel with a bed and banks. When surface waters reach and *become part of* a natural watercourse, they lose their character as surface waters and come under the rules governing watercourses." 78 Am. Jur. 2d Waters § 189 (emphasis added). In other words, surface waters do not lose their classification as such until they "become part of" the naturally flowing water and "[begin] to flow" in that manner. *Id.*

Here, Good River presented evidence that showed the surface water did not become part of the naturally flowing water. S. Turner Wimberly testified that the 2015 flood did not act like prior flood events, noting that the river was back in its banks the next day but had left scouring as much as five feet deep and that there had been a clear decrease in the height of Defendants' retaining embankment on the southern side of the river in the immediate aftermath of the 2015 flood. (Tr., Dkt. 143-1, at 8–17). Further, Jorge Lopez Tapia testified that water started to rise quickly around 6:00 in the afternoon and could see the water "coming across" after it started to go over the wall.

---

[4] The question is likely unaddressed because the circumstances are extremely uncommon. It is extremely rare that impoundment of surface water is so extreme as to momentarily diver the flow of a river is a perpendicular direction. Nonetheless, as the jury found it, that appears to have happened here, where the collection of surface water was so massive that it briefly overcame the natural flow of the river.

(*Id.* at 23–35). Good River's witness, John F. McIntyre, showed modeling that the peak river flow occurred *before* the flood on Good River's farm and that the flood could not be explained except by some external water flow. (*Id.* at 74). In short, there was more than enough evidence for a reasonable jury to find that the flooding was caused by Defendants' surface water.

Indeed, the jury instructions themselves included the definition of surface water as given in *Dietrich* and the line of cases cited therein. (Jury Charge, Dkt. 130, at 6 (defining "Surface Waters" as those "which are diffused over the ground . . . continue to be such until it reaches some bed or channel in which water is accustomed to flow and ceases to be such when it enters a water course in which it is accustomed to flow."); *Dietrich*, 123 S.W.3d at 417 (defining same)). Having been provided this definition, the jury found that Defendants did divert or impound the natural flow of surface waters in a manner that proximately caused damage to Good River's property. (Verdict, Dkt. 135, at 3). Ultimately, whether the surface water "became a part of" the river was a question of fact for the jury, and this Court will not disturb the jury's finding on that point.

### B. Negligence

Defendants next argue that Good River failed to provide sufficient evidence to support a finding of negligence on behalf of Martin Marietta. For the reasons already discussed, Defendants posit that Good River cannot show a violation of § 11.086 and should not be able to plead negligence as a workaround to the statute's purported limitation. (Mot. JMOL, Dkt. 140, at 11–12).[5] Because the waters that flooded Good River's farm are arguably "floodwaters," Defendants argue they owed no duty because the State has a non-delegable duty to control floodwaters. (*Id.*). Good River argues that there was a duty because the jury found that the waters which damaged its farm were still surface waters. (Resp., Dkt. 143, at 12–13). It further argues that, under a general theory of

---

[5] The Court need not rehash its analysis of whether § 11.086 applies. If a plaintiff cannot prove a violation of § 11.086, then they cannot recover for the negligent violation for that specific statute. Instead, the Court will focus on whether a defendant may unnaturally impound surface water in a way that is outside the scope of § 11.086.

12

negligence, Defendants should have foreseen the risk of surface water flooding across the Colorado River and are therefore liable for its damages. (*Id.*).

The parties do not dispute that the State has a non-delegable duty to control floodwaters. (Mot. JMOL, Dkt. 140, at 11 (citing *TWU*, 221 S.E.3d at 278)). A private defendant cannot be held liable for failing to control floodwaters because the State, and the State alone, possesses that duty. (*Id.*). Defendants rely again on *Bonin II* for the proposition that its duty to control surface water ended because the surface water on its property mixed with the Colorado River floodwater before flowing onto Good River's farm. (Mot. JMOL, Dkt. 140, at 12 (citing *Bonin II*, 2019 WL 1246259, at *6–7.). As stated before, *Bonin II* is not binding on this Court.[6] But even if it were, the facts of *Bonin II* are substantially different from those presented here at trial. In *Bonin II*, the defendants released impounded surface water into the Sabine River, where it joined with the waterflow and then flooded plaintiffs' property downstream. *Bonin II*, 2019 WL 1246259, at *6–7. By contrast, the water that spilled onto Good River's farm flowed "perpendicular" to the Colorado River and did not join the river's natural flow.

The core of Defendants' argument is that their duty to control surface water on their property ended when the water reached the Colorado River. (Mot. JMOL, Dkt. 140, at 11–12). But beyond *Bonin II*, there is little support for this argument. Negligence requires showing that a legal duty is owed to a plaintiff, breach of that duty, and that damages were proximately caused by that breach. *See, e.g.*, *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). When given these elements, the jury found that Defendants acted with negligence. (Verdict, Dkt. 135). The jury found that it was foreseeable that the surface water accumulating in Defendants' pit would have overflowed and gushed across the river onto Good River's property. The fact that Defendants owed

---

[6] The holding in *Bonin II* appears to rest in part on the fact that the cases cited by the defendants in that case were "not disputed nor distinguished by the Plaintiffs." *Bonin II*, 2019 WL 1246259, at *7. That is, of course, no reason to automatically disregard the court's holding, but it would be questionable to accept that court's interpretation of Texas law as authoritative when only one side had even briefed the issue.

no duty to control the Colorado River does not affect whether they had a duty to control the surface water on their property. If it was foreseeable that the surface water would gather in such an enormous volume that when it burst, it would flood across a separate body of water, then Defendants can be held liable for negligence. The fact that a defendant does not owe a duty as to what happens between the two properties speaks to foreseeability and causation, not duty. Regardless of whether the water had become floodwater when it reached Good River's property, it was Defendants' duty *as to its surface water* which was breached. Because the damage was foreseeable and proximately caused by the breach, Defendants are liable for negligence.

Defendants argue that Good River should not be allowed to use negligence as a "end-run" around the requirements of § 11.086. Ultimately, however, the question is moot because the jury found that Defendants both violated § 11.086 and common law negligence. Rather than an end-run around, a plaintiff claiming negligence must establish *more* elements than strict liability under § 11.086. *See TWU*, 221 S.W.3d at 283 (noting that § 11.086 is a strict liability offense). If § 11.086 does supplant negligence claims entirely, Defendants do not cite any cases to that point, and the Court is unaware of any. *See id.* (allowing negligence claims to proceed along with plaintiff's § 11.086 claim). Accordingly, Defendants' motion is denied as to its negligence defense.

### C. Proximate Causation

Finally, Defendants argue that the evidence presented at trial does not show Defendants proximately caused the flood damage to Good River's property. (JMOL, Dkt. 140, at 13–15). Here, Defendants' argument goes to the weight of evidence, not its existence. The court may grant a motion for judgment as a matter of law "[o]nly when the facts and reasonable inferences are such that a reasonable juror could not reach a contrary verdict." *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir. 1998). "If reasonable persons could differ in their interpretation of the evidence, the motion should be denied." *Id.* At trial, Good River introduced evidence that the Colorado River's flooding

peaked well before Good River farms was flooded. (*See* Resp., Dkt. 143, at 14 (listing witness testimony about the timing of the flood)). Several eyewitnesses testified to seeing the water crest over Defendants' property and begin to head towards Good River's farm. (*Id.*). The jury weighed this testimony, Defendants' own witnesses and experts, and found that there was proximate cause. This is precisely the sort of evidence that reasonable persons can dispute, but it is not for the Court to question this finding of fact.[7]

Defendants further argue that Good River was required by law to produce an expert witness to testify as to causation. (Mot. JMOL, Dkt. 140, at 14–15). However, Defendants did not raise this issue in their original motion or at trial. (*See* Mot. JMOL, Dkt. 128). Accordingly, the argument has been waived. *See Arsement v. Spinnaker Expl. Co., LLC*, 400 F.3d 238, 247 (5th Cir. 2005) ("If a party fails to raise an issue in its Rule 50(a)(1) motions at trial, it may not do so in its post-trial Rule 50(b) motion.") (citations omitted).

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendants' motion for judgment as a matter of law, (Dkt. 140), is **DENIED**.

**SIGNED** on April 11, 2023.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

[7] Defendants state that there was no proximate cause because they did no more than "furnish a condition which makes the injuries possible." (Mot. JMOL, Dkt. 140, at 15 (citing *Bonin II*, 2019 WL 1246259, at *8; *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017))). Defendants read the word "condition" too far. The Texas Supreme Court has used the word condition to describe scenarios with "but-for" causation but without proximate causation. *See Allways Auto*, 530 S.W.3d at 799 (holding that loaning a friend a car was a "condition" that did not create liability for an accident 18 days later); *Union Pump Co. v. Allbritton*, 898 S.W.2d 773 (Tex. 1995), *abrogated by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007) (holding that a fire was a "condition" when, hours after it was extinguished, a person slipped and fell trying to close a valve on the site of the fire). In other words, the phrase "condition" refers to scenarios where the alleged wrongful conduct is too attenuated from the injury to establish causation. That is simply not the case here, where the flooding flowed rapidly over and onto Good River's property. The Texas Supreme Court's definition of "condition" simply does not apply to flooding from one property to another.